UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

UNITED STATES OF AMERICA          CRIMINAL NO. 06-50112-01

versus                                              JUDGE STAGG

RUBEN WILSON                              MAGISTRATE JUDGE HORNSBY

**REPORT AND RECOMMENDATION**

**Introduction**

Before the court are Defendant's Motion to Suppress (Doc. 91) and Supplemental Motion to Suppress (Doc. 101). Defendant contends that his recorded statement to DEA agents was the product of coercion and duress and made pursuant to an illegal arrest and detention. An evidentiary hearing was held on February 22, 2007. Following the hearing, Defendant filed a supplemental brief. Doc. 115. For the reasons that follow, it is recommended that Defendant's motions to suppress be denied.

**The Facts**

The evidence at the hearing established the following facts. On or about April 25, 2005, Defendant contacted Trooper Hank Haynes, who is assigned to the DEA Task Force, and told Haynes that he has some information he wanted to trade concerning Soloman Rodriguez in Ringgold, Louisiana. Trooper Haynes had known Defendant since the early 1990's. In fact, Defendant had Haynes' cell phone number and would call Haynes from time to time. At the time Defendant called Haynes in April 2005, Defendant was on supervised release in connection with a prior felony drug conviction.

Defendant lived in Arlington, Texas, so Trooper Haynes and Defendant agreed to meet the next day in Canton, Texas, which is about half-way between Arlington and Shreveport. DEA agent Mike Hembree and Trooper Jay Perry accompanied Haynes to the meeting. In Canton, Defendant voluntarily got into the agents' vehicle. He told them that he recently met Soloman Rodriguez at a gas station. Defendant had known Rodriguez since they met at a half-way house in July 2003. According to Defendant, at the gas station, Rodriguez told Defendant that he (Rodriguez) had been dealing with "one of your boys" in Louisiana who had recently been arrested. Defendant interpreted that to mean Jonathan Davis (a co-defendant in this case).

Jonathan Davis had been arrested on April 15, 2005 and, in a jail interview with Agent Hembree, Davis implicated Defendant in the distribution of methamphetamine. Trooper Haynes believed that Defendant wanted to meet with the police in April 2005 because Defendant believed that his world was falling around him. Similarly, Agent Hembree testified that Defendant was probably scared because Davis had been arrested and may have furnished information on Defendant.

During the meeting in Canton, Defendant told the agents he wanted two favors in exchange for information on Rodriguez: (1) early termination of his supervised release; and (2) transportation for his brother, who was in federal prison, to his mother's funeral. (Defendant's mother had been pronounced brain dead on April 20, 2005.) Trooper Haynes told Defendant he would check on Defendant's requests and get back with him. Haynes later

told Defendant that the agents could not comply with his requests. The agents did not speak with Defendant again until February 14, 2006 when Defendant gave the recorded statement that is the subject of Defendant's motions to suppress. However, they conducted surveillance on Defendant on August 25 and 26, 2005.

DEA agents from Shreveport arrived in Arlington on February 13, 2006, the day before the recorded statement. Defendant was a target of a DEA investigation, and agents wanted to try to obtain his cooperation. (Defendant had previously cooperated with law enforcement in the 1990's.) The agents attempted to conduct surveillance with the hope that they could quietly approach Defendant away from his home (in order to maintain secrecy regarding his cooperation), but they were unable to locate Defendant's vehicle. Agents then contacted Defendant's federal probation officer, Ken Mays, who was in the field conducting home visits, and asked Mays to go to Defendant's home and see if he was there. Mays agreed, and on February 14, 2006 at approximately 10:00 a.m., Mays made a brief, unannounced visit to Defendant's home.

Mays knew that the purpose of the visit was to try to secure Defendant's cooperation. In fact, Defendant had previously disclosed to Mays that he had been in contact with the DEA, and Mays reminded Defendant not to work as a CI without court approval. Prior to the interview in question, Mays knew that Defendant was the target of an investigation. Mays testified that court approval was not necessary for agents to interview Defendant.

Mays spoke to Defendant briefly, and then he and Defendant walked out of

Defendant's home and onto the driveway. Defendant told Mays that he had just been married, and Mays told Defendant to report to the probation office the next day with a copy of his marriage license.

While Mays and Defendant were standing outside Defendant's home, approximately five agents drove up in front of the house. Two agents, Hank Haynes and Jimmy Ogden, approached Defendant. Ogden introduced the agents to Defendant and told Defendant that his name had come up in an investigation concerning drug dealing in Ringgold. Ogden told Defendant that, if Defendant wanted to cooperate, then "now's the time." Defendant then looked at Haynes, who told Defendant that "it's serious" and "the best thing you can do is cooperate."

The agents asked Defendant if they could talk in private. Defendant agreed, but asked if he could go inside his home and retrieve his shoes and cell phone. Haynes and Ogden entered the home with Defendant for that purpose, and they noticed that another person, later identified as Defendant's father-in-law, was asleep on a sofa.

Defendant was driven to a large public park about a block from his home. Agent Hembree was not among the agents who went to Defendant's home. Instead, he waited for Defendant, Haynes and Ogden at the park. Other agents were staked out around the park for security reasons, but Defendant was not aware of their existence. Once Defendant arrived at the park with Ogden and Haynes, Hembree joined them, and the four men (Defendant, Hembree, Ogden and Haynes) sat in Haynes' SUV. Defendant sat in the front passenger seat.

Deputy Jess Ketchum was parked next to the SUV in another vehicle. At no time during the encounter was Defendant handcuffed, told he was under arrest or that he was not free to leave. No weapons were drawn.

When Defendant got into Hayne's SUV, Ogden told him why the agents were there and showed Defendant an unsigned application for an arrest warrant, along with an unsigned affidavit. The agents brought the unsigned warrant because they wanted Defendant to see the accusations against him and give Defendant an opportunity to cooperate. Defendant began to read the unsigned affidavit for the warrant and then asked the agents what they wanted to know. Ogden then read Defendant his <u>Miranda</u> rights, and Defendant signed a DEA form waiving those rights at approximately 10:10 a.m. Govt. Ex. 2. Defendant asked for some cigarettes, and Haynes went to the store in another agent's vehicle and purchased some for him.

The tone of the recorded interview, as reflected in the recording (Govt. Ex. 1) and by the transcript (Govt. Ex. 1-A), is friendly and cooperative, and there is no indication that Defendant was under any duress. Defendant was never told that he would be arrested if he failed to cooperate.

The interview ended at approximately 11:45 a.m., which is approximately an hour and a half after it began. After the interview was concluded, the agents asked Defendant to make a recorded call to Tubby Johnson to see if Johnson could supply drugs. After that call, the agents dropped Defendant off at his home. At this point, the agents believed Defendant

wanted to cooperate, and Hembree and Ogden planned to contact the court and the probation office to obtain permission for Defendant to cooperate.

Defendant reported to his probation officer, Mr. Mays, on February 15, 2006 (the next day). Defendant told Mays that he had been strong-armed by the agents, placed in a vehicle and coerced. Mays then asked Defendant if he wanted to cooperate with the agents, but Defendant would not give Mays a direct answer. Based on that conversation, Mays did not attempt to get approval from the court and his superiors for Defendant to cooperate. Defendant later contacted Trooper Haynes and told him that he had a lawyer and he did not want to cooperate. Haynes told Defendant not to call him anymore if he had a lawyer.

Defendant nevertheless called Haynes again, just prior to the hearing on the motions to suppress. During that call, Defendant told Haynes that "court could get nasty" and that he "didn't want any hard feelings."

**Analysis**

Defendant argues that his recorded statement was unconstitutionally obtained under coercion, duress and pursuant to a wrongful arrest or detention. Defendant's Brief (Doc. 115), pp. 3-4. A confession is voluntary if it is the product of the defendant's free and rational choice; it is voluntary in the absence of official overreaching either by direct coercion or subtle psychological persuasion. United States v. Bell, 367 F.3d 452, 460-461 (5th Cir. 2004); United States. v. Mullen, 178 F.3d 334, 341 (5th Cir. 1999). The statement must be voluntarily, knowingly and intelligently made, and the individual confessing must

be cognizant of the rights being abandoned and the consequences of doing so. United States v. Santiago, 410 F.3d 193, 202 (5th Cir. 2005).

When the defendant challenges the voluntariness of his confession, the government must prove its voluntariness by a preponderance of the evidence in order for the confession to be admissible as substantive evidence at trial. United States v. Clay, 408 F.3d 214, 221 (5th Cir. 2005). Voluntariness is evaluated based on the totality of the circumstances, including the characteristics of the accused and the details of the interrogation. Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973). See also United States v. Barlow, 41 F.3d 935 (5th Cir. 1994). Factors include the age of the accused, his intelligence and education, advice regarding his constitutional rights, length of detention, repeated and prolonged nature of the questioning and whether physical punishment such as deprivation of food or sleep was imposed. Id. No case turns on the presence or absence of a single factor. Id.

Contrary to Defendant's contentions, he was not subjected to an illegal arrest or detention on February 14, 2006. He was approached by two agents at his home, told that his name had come up in a drug investigation and he was asked to accompany the agents to a more private location. Defendant agreed to go with the agents. Before leaving his home, Defendant was allowed to reenter to obtain his shoes and cell phone. He was not handcuffed, and he was never told that he was under arrest or not free to decline the agents' requests. Defendant is a very large man, approximately 6' 6" tall and about 330 pounds. The agents' actions that day are inconsistent with an arrest of Defendant.

Defendant makes much of the fact that he was not allowed to enter his home alone to retrieve his shoes (he denies retrieving his cell phone) and that, while at the park, he was not allowed to go to the restroom alone. The most reasonable explanation for these precautions is the agents simply did not want Defendant to be able to retrieve a weapon prior to or during their interview.

Defendant testified that, when the agents arrived at his home, they told him they had a warrant for his arrest and he assumed he was going to jail. He testified that, while at the park, he was uncomfortable and asked to be taken back home. He also testified that all three agents in the SUV yelled at him. Thus, according to Defendant, he began to tell them what they wanted to hear.

Defendant's testimony is not credible. It is belied by the recording of the interview, including the nature and tone of the agents' questions and Defendant's answers. Defendant's testimony is also belied by his prior experience with the criminal justice system, including his prior cooperation with law enforcement. Furthermore, on the witness stand, Defendant came across as a very intelligent person. He admitted on cross-examination that he had been advised of his rights before this incident and that he knew his rights. He knew he did not have to make a statement; he knew he had a right to counsel; and he knew he did not have to cooperate in the investigation.

The credible evidence shows that Defendant voluntarily gave the recorded statement, but later changed his mind about cooperating. He now argues that he was illegally arrested

and detained and that he was coerced into making the statement. Nevertheless, the facts show he was not arrested or detained. Had Defendant asked to leave, he would have been allowed to leave. He was never restrained. He was not taken to a jail; instead, he was taken to a public park. The location of the interview (an agent's vehicle in a public park) was similar to the circumstances concerning Defendant's prior meeting, set up at the request of Defendant, with Trooper Haynes, Agent Hembree and Trooper Perry in Canton, Texas in April 2005. Prior to giving the recorded interview, Defendant was properly advised of his rights and signed a written waiver of those rights. Govt. Ex. 2. The entire encounter lasted less than two hours. There is no evidence Defendant was denied anything he need or requested. And the recording itself is strong evidence that Defendant was not under duress and not coerced into making statements during the interview.

After considering the relevant factors, including the totality of the circumstances, the undersigned finds that Defendant's recorded statement was not the product of an illegal arrest or detention or the product of duress or coercion. Defendant freely and voluntarily submitted to the interview with the agents, and he voluntarily, knowingly and intelligently waived his rights and gave the recorded statement. Thus, there is no basis upon which to suppress Defendant's recorded statement.

Accordingly;

**IT IS RECOMMENDED** that Defendant's Motion to Suppress and Supplemental Motion to Suppress (Docs. 91 and 101) be **denied.**

### **Objections**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Cr. P. 59(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Cr. P. 59(b)(2). A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 10 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED at Shreveport, Louisiana, this 8th day of March, 2007.

_____
MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE